UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WIDMANN H.,[1]

      Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

Case No. 2:22-cv-12537

Magistrate Judge Kimberly G. Altman

## OPINION AND ORDER ON
## CROSS MOTIONS FOR SUMMARY JUDGMENT

I.      Introduction

This is a social security case.  Plaintiff Widmann H. brings this action under

42 U.S.C. § 405(g), challenging the final decision of defendant Commissioner of

Social Security (Commissioner) denying his application for Disability Insurance

Benefits (DIB) and Supplemental Security Income (SSI) under the Social Security

Act (the Act).  The parties have consented to the undersigned's jurisdiction

including entry of a final judgment under 28 U.S.C. § 636(c).  (ECF No. 12).  Both

---

[1] Consistent with guidance regarding privacy concerns in Social Security cases by
the Judicial Conference Committee on Court Administration and Case
Management, this district has adopted a policy to identify plaintiffs by only their
first names and last initials.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

1

parties have filed summary judgment motions, (ECF Nos. 15, 17), which are ready for consideration.

For the reasons set forth below, Plaintiff's motion, (ECF No. 15), will be DENIED; the Commissioner's motion, (ECF No. 17), will be GRANTED; and the decision of the administrative law judge (ALJ) will be AFFIRMED.

## II.    Background

### A.    Procedural History

Plaintiff was almost 50 years old at the time of his alleged onset date of May 1, 2015. (ECF No. 10-5, PageID.322, 325). He attended four or more years of college and had past relevant work as a researcher, graduate student, lab technician, and landscaper. (ECF No. 10-6, PageID.351). Plaintiff alleges disability due to major depressive disorder, attention deficit disorder, anxiety disorder, and severe alcohol abuse in remission. (*Id.*, PageID.350).

Plaintiff filed applications for SSI on May 31, 2019, and DIB on June 3, 2019. (ECF No. 10-5, PageID.322, 325). His applications were initially denied on August 10, 2020. (ECF No. 10-4, PageID.189-217). Plaintiff timely requested an administrative hearing, which was held before the ALJ on June 22, 2021. (ECF No. 10-2, PageID.65). Plaintiff testified by video at the hearing, as did a vocational expert. (*Id.*). He offered the following testimony.

Plaintiff was not working at the time of the hearing and had not worked

2

outside of the university setting in the last fifteen years. (*Id.*, PageID.68-69). He had last worked doing research in a lab at the University of Michigan's physiology department. (*Id.*). He taught sometimes as well, but this was dependent on the grant funds available. (*Id.*, PageID.69-70).

Plaintiff became sober around Halloween of 2017. (*Id.*, PageID.73). For around two months prior to that, Plaintiff would drink a quart of scotch on a daily basis. (*Id.*). Throughout his life, Plaintiff had suffered bouts of depression. (*Id.*, PageID.75). This began in childhood, but as he got older, the bouts increased in frequency and severity. (*Id.*). His last bout of depression began five years ago and had not gotten any better. (*Id.*).

Plaintiff found sleep to be difficult; he took medication, which "kind of work[ed]," but still often had trouble falling and staying asleep. (*Id.*, PageID.76). Plaintiff either slept too long or too little, and upon waking, spent the day on the couch. (*Id.*). He did not watch TV and did not want to go anywhere or do anything. (*Id.*). Regarding the ability to do a simple, repetitive job, Plaintiff believed his sustained mental and physical fatigue throughout the day would interfere. (*Id.*, PageID.77). The way that his attention deficit disorder interacts with his depression made even brewing a pot of coffee difficult. (*Id.*). He did not regularly bathe and had trouble dealing with his medications. (*Id.*). The only meals he could prepare were made in his rice cooker, because the food could not

burn or stick to the inside.  (*Id.*, PageID.77-78).

Plaintiff did not eat every day, and he was not regularly bathing because his bathtub was full of household items, including a slow cooker containing spoiled food.  (*Id.*, PageID.78-79).  His kitchen sink was full of similar items.  (*Id.*, PageID.80).  Plaintiff could read for pleasure, because he could always return to where he left off if he got distracted.  (*Id.*, PageID.82).  He could not maintain concentration for anything audio or video.  (*Id.*).  Plaintiff used to have a lot of friends, but he would not want to get together with them, and they would move on. (*Id.*, PageID.84-85).

Plaintiff attended Alcoholics Anonymous (AA) meetings when he first stopped drinking in 2017, but stopped after about a month.  (*Id.*, PageID.86).  He was hospitalized in September 2017, and thereafter was treated at Home of New Vision in Ann Arbor, Michigan.  (*Id.*).  Plaintiff had a driver's license, but no longer drove as he did not have a vehicle.  (*Id.*, PageID.87).  He did not use public transportation, relying on his mother and brother to help him with things.  (*Id.*, PageID.89).  The ALJ asked Plaintiff if the drinking is what stopped him from working, to which he answered "no, the drinking kept me from killing myself." (*Id.*, PageID.91 (cleaned up)).

On August 2, 2021, the ALJ issued a written decision finding that Plaintiff was not disabled.  (*Id.*, PageID.42-59).  On January 28, 2021, the Appeals Council

denied Plaintiff's request for review, (*id.*, PageID.27-32), making the ALJ's

decision the final decision of the Commissioner.  Plaintiff timely filed for judicial

review of the final decision.  (ECF No. 1).

### B.   Medical Evidence

The medical records reflect that Plaintiff began treatment at IHA Family

Medicine Ann Arbor (IHA) on May 23, 2014.  (ECF No. 10-7, PageID.480).  He

was seen by Marlis Pacifico, M.D. (Dr. Pacifico), reporting depressed mood,

difficulty concentrating, difficulty falling asleep, diminished interest or pleasure,

and restlessness.  (*Id.*).  He also reported that functioning was very difficult but

denied difficulty staying asleep or thoughts of death or suicide.  (*Id.*).  His history

included depression and medication, but no history of suicide attempts.  Dr.

Pacifico noted that Plaintiff's nausea was associated with his depression and

assessed a patient plan for Plaintiff to find a therapist and psychiatrist.  (*Id.*).

Plaintiff's next medical record from IHA is from almost two years later,

dated March 3, 2016.  (ECF No. 10-7, PageID.472).  He reported to Dr. Pacifico

that functioning was "not difficult at all," but that he was struggling with

"anxious/fearful thoughts and depressed mood[.]"  (*Id.*).  He denied diminished

interest or pleasure as well as fatigue.  (*Id.*).  Based on Plaintiff's research, he had

decided to wean off medications when he was not suffering severe depression and

had been off of his medications for six months at that time.  (*Id.*).

Plaintiff returned to Dr. Pacifico on March 31, 2016, for back pain and hypertension issues. (*Id*., PageID.468). Although he was not seen for psychiatric issues, he was found to be oriented to time, place, person, and situation, with an appropriate mood and affect. (*Id*., PageID.470-471). He also had normal insight and judgment. (*Id.*). This was the case for subsequent visits on July 16, and October 4, 2016, as well, although on the latter visit he was anxious with difficulty concentrating, and felt "down, depressed or hopeless." (*Id.*, PageID.455-466).

From October 15 to 31, 2017, Plaintiff was treated at Ascension Brighton Center for Recovery to undergo detox for alcohol abuse. (*Id.*, PageID.561). He was discharged and referred to Home of New Vision for intake on November 2, 2017. (*Id.*, PageID.560).

On October 15, 2017, Plaintiff reported that he was not suicidal or homicidal, but that he drank alcohol to self-medicate for depression. (*Id.*, PageID.570). He stated that he was "kicked out" of his neuroscience program after a fight with the director a year prior and broke up with his girlfriend of two years when he started drinking two months prior. (*Id.*). He was found to be oriented to time, place, person, and situation; had intact recent and immediate memory; and a stable mood, congruent affect, intact mental status, and cognition with "distortions consistent with addiction." The form indicated that Plaintiff was diagnosed with anxiety and depression but was not currently on any prescriptions. (*Id.*,

PageID.577).

On October 27, 2017, Plaintiff answered a patient health questionnaire, indicating that he had "[l]ittle interest or pleasure in doing things," felt "down, depressed, or hopeless," was tired or had little energy, and felt bad about himself on "several days." (*Id.*, PageID.569). He had trouble falling or staying asleep and trouble concentrating on things like reading or watching television on "more than half the days." (*Id.*, PageID.573). He was not troubled with any of the questionnaire's listed problems to the extent that it was "nearly every day." (*Id.*).

According to progress notes, Plaintiff arrived early for intake at Home of New Vision on November 9, 2017. (ECF No. 10-7, PageID.658). At that time, Plaintiff was alert and oriented and participated fully in clinical intake, though he sometimes appeared to be reluctant to give complete answers while at other times "going into much detail." (*Id.*). Plaintiff was seen on a weekly basis throughout November, continuing to be alert and oriented and discussing his stressors, which were work, his recently ended long-term relationship, and abstaining from alcohol. (*Id.*, PageID.655-657).

On November 28, 2017, Plaintiff arrived for his appointment but left because staff was running behind. (*Id.*, PageID.655). He also requested a new therapist and canceled his upcoming appointment with his old therapist on December 5, 2017. (*Id.*).

Plaintiff began seeing John DeVivo, LMSW (DeVivo) on December 11, 2017.  (*Id.*, PageID.654).  He presented in a serious and stable mood; was oriented to time, person, and place; and denied suicidal, homicidal, or "self-harm" ideation.  (*Id.*).  Plaintiff worked on processing his history of drinking, the loss of his father and relationship, and the loss of a job.  (*Id.*).  His "depression issues" were also discussed.  (*Id.*).  He continued to attend weekly therapy through December with similar presentation, though his mood was sad on December 18, and he discussed how he needed to drink to break the cycle of depression on December 27.  (*Id.*, PageID.652-653).

Twice weekly sessions continued from January through September 2018.  (*Id.*, PageID.649-651).  Plaintiff was at times agitated, grieving, tearful, and serious, but also stable, with other presentations similar to before.  (*Id.*).  On April 2 and 9, 2018, he presented with a flat affect, (*id.*, PageID.637, 639), but he began presenting mostly with a "stable and calm mood" in July 2018, (*id.*, PageID.603-618).  On August 23, 2018, Plaintiff discussed the need to obtain employment and the changes that would bring to his life.  (*Id.*, PageID.610).

Plaintiff continued to attend therapy, and on September 24, 2018, shared that he had been sober for a full year but had begun to have strong cravings and the desire to drink on a daily basis.  (*Id.*, PageID.784).  In November 2018, Plaintiff confided that he was dealing with depression more effectively, (*id.*, PageID.775),

8

but through December 2019 he continued to struggle with depression, (*id.*, PageID.724-784).

On December 17, 2018, Plaintiff shared his desire to re-enter the workforce, (*id.*, PageID.766), but on February 18, 2019, he discussed applying for social security with a caseworker, (*id.*, PageID.759). He also attempted to process "the depth of his depression," (*id.*, PageID.751), and realized that his procrastination and indecision "create self-harm" (*id.*, PageID.749). On May 13, 2019, Plaintiff noted increasing struggles with depression, becoming more isolated and less motivated and having less energy. (*Id.*, PageID.748). He made an appointment with Leon Quinn, M.D. (Dr. Quinn) to revisit his medications and dosages. (*Id.*). On June 10, 2019, he was concerned with "significant depression returning." (*Id.*, PageID.744).

Plaintiff sought another possible medication change on September 3, 2019, (*id.*, PageID.736), and on October 14, 2019, noted that he felt more stable on new medication, (*id.*, PageID.731). Despite this improvement, Plaintiff continued to struggle with depression in his November 2019 sessions. (*Id.*, PageID.726-727).

On January 8, 2020, Plaintiff felt more stable and confident about his mood and well-being. (*Id.*, PageID.798). He transitioned to weekly sessions, and felt "less depressed" on January 15, 2020. (*Id.*, PageID.799). Nevertheless, Plaintiff continued to be depressed throughout 2020, and on March 1, 2020, DeVivo opined

that Plaintiff had a "moderate difficulty in functioning due to mental health problems." (*Id.*, PageID.807).  During his April 22, 2020 session, Plaintiff said he "felt that he [was] not contributing to society" and was "a bit self depreciating." (*Id.*, PageID.815).  On April 29, 2020, Plaintiff "reported feeling depressed and immobilized at hom[e] during this pandemic." (*Id.*, PageID.817).  On May 6, 2020, he felt energized and motivated, but on May 13, he was "depressed and void of feelings," "recognize[d] his enjoyment of life more on certain days," but reported "his desire to obtain a second opinion from another psychiatrist on medications for his depression along with discussing directly his struggles with his current psychiatrist." (*Id.*, PageID.819-821).

To that end, Plaintiff saw Dr. Quinn on July 15, 2020. (*Id.*, PageID.835). Dr. Quinn assessed the following: good insight, fair judgment, mildly constricted affect, somber mood, intact memory, and improved attention and concentration with medication. (*Id.*).  Plaintiff also had appropriate thought content, intact perception, unremarkable flow of thought, appropriate interview behavior, normal speech, and orientation to person, place, and time. (*Id.*).  Dr. Quinn wrote that Plaintiff "has been doing nothing different" during the pandemic, "which equates to not doing much of anything." (*Id.*, PageID.836).  He had little contact with anyone and had limited activities, but while "not ecstatic about his current situation, he seems to be tolerating it okay." (*Id.*).  Dr. Quinn also noted that

Plaintiff had no medication side effects but had "not taken Concerta for a while." (*Id.*).

On July 23, 2020, Plaintiff saw DeVivo and presented "flatter today than of late[.]" (*Id.*, PageID.838). He saw Dr. Quinn again on August 21, 2020, who found Plaintiff's affect to be "constricted" but assessed normal findings in the other mental status realms. (*Id.*, PageID.844). Plaintiff had called because he missed an appointment on August 19, and to request a Fluoxetine refill. (*Id.*, PageID.845). Dr. Quinn mailed him extensions for Concerta as well. (*Id.*). No medication changes seemed necessary at that time. (*Id.*).

Plaintiff continued to attend weekly or biweekly sessions with DeVivo through September 2020, to work on his depression. (*Id.*, PageID.846-903). He saw Dr. Quinn again on September 30, 2020, presenting with a mildly constricted affect, dysphoric mood, and soft speech, but otherwise normal mental status. (*Id.*, PageID.904). Dr. Quinn found that Plaintiff "displayed little affect" and seemed "resigned to a rather isolated existence." (*Id.*, PageID.905). Despite this, Plaintiff told Dr. Quinn that "he did not feel that he was currently at risk to resume drinking" as he was "no longer that depressed[.]" (*Id.*). Dr. Quinn noted that Plaintiff last picked up a Concerta prescription on September 2, 2020, and likely needed a new prescription mailed to him. (*Id.*).

Plaintiff continued therapy with DeVivo. On October 5, 2020, they

11

discussed the need to treat his depression "more fully" due to the decrease in activity and being outside during the pandemic. (*Id.*, PageID.908). He met with Dr. Quinn again on November 4, 2020, with Dr. Quinn assessing fair insight, constricted affect, and mildly dysphoric mood. (*Id.*, PageID.912). Plaintiff also exhibited slow, deliberate speech. (*Id.*). Plaintiff told Dr. Quinn that outside of a trip to the grocery store, he has had no other recent outdoor activity. (*Id.*, PageID.913). He was sleeping "okay" and had last picked up his Concerta on October 5, 2020, for which he used an August 2020 prescription. (*Id.*). Medications were unchanged. (*Id.*).

On November 9, 2020, Plaintiff confided in DeVivo that he found it difficult to change his negative self-dialogue. (*Id.*, PageID.916). He wanted a solution to the negative self-dialogue, which immobilized him and made him feel worthless. (*Id.*). In the past, he used alcohol to numb this feeling. (*Id.*). At his next session on November 16, 2020, Plaintiff shared that he was dissatisfied with his depression, "how difficult everything still can be for him," and how his consultation with his psychiatrist was not fruitful. (*Id.*, PageID.918). Plaintiff was concerned because he used to drink when similarly discouraged and ultimately wind up in a deeper state of depression. (*Id.*).

Plaintiff saw Dr. Quinn again on January 6, 2021. (ECF No. 10-9, PageID.1128). His insight was fair, affect constricted, and mood dysphoric. (*Id.*).

12

Plaintiff told Dr. Quinn that he had recently spent two weeks at his mother's house and "for the first time in quite some time" Plaintiff prepared a meal—pea soup— rather than eating prepackaged or canned food. (*Id.*). Plaintiff had seen his brother and brother's children briefly on Christmas but "seem[ed] content with resuming his former, reclusive lifestyle." (*Id.*). Plaintiff had no complaints about his medications or side effects but had a somber mood and dimly restricted affect. (*Id.*). He requested to move his next appointment to an earlier date despite rarely needing changes in medication. (*Id.*). Dr. Quinn documented that he would send Plaintiff a new Concerta prescription as Plaintiff was about to use his last one. (*Id.*).

Plaintiff continued to see DeVivo for weekly therapy sessions from January to June 2021. (*Id.*, PageID.1133-1200). Throughout these sessions, he continued to work on his depression, sobriety, and managing negative self-dialogue. (*Id.*). He noted on March 1, 2021, that he could not be around other people that were drinking, which required him to avoid family gatherings that involved alcohol. (*Id.*, PageID.1153).

Plaintiff returned to Dr. Quinn on February 10, 2021, with good insight and judgment, appropriate affect, and only moderately dysphoric mood. (*Id.*, PageID.1143). He told Dr. Quinn that he seldom left his apartment and had not picked up his Concerta but had picked up his other medications. (*Id.*). He said that

he had not been taking Concerta regularly "because it was too cold to walk to the pharmacy" but planned to pick it up soon. (*Id.*). Plaintiff had developed an interest in downloading books for free, and said that he was working with his therapist to understand why he drank in the past in order to "keep from resuming use down the road." (*Id.*).

On March 9, 2021, Plaintiff presented to Dr. Quinn with fair insight, constricted affect, and dysphoric mood. (*Id.*, PageID.1157). He also had apathetic interview behavior and soft speech. (*Id.*). Dr. Quinn noted that Plaintiff's "narrative was without much enthusiasm." (*Id.*, PageID.1158). Regarding medications, Plaintiff had picked up a month supply of Concerta on February 23, but wanted to switch to Methylphenidate for the next month, which is short acting. (*Id.*). Dr. Quinn provided prescriptions for both. (*Id.*).

Plaintiff next saw Dr. Quinn on April 7, 2021. (*Id.*, PageID.1168). He presented with fair insight, blunted affect, and mildly dysphoric mood. (*Id.*). Dr. Quinn remarked that Plaintiff "seem[ed] to be more active" and "in fact cooked a chicken pot pie yesterday," but "has never cooked anything using the stove in his apartment in all the time he has resided there." (*Id.*, PageID.1169). Plaintiff was visiting his mother at the time, but "[u]nfortunately [would] likely resume his life of relative inactivity when he return[ed] to his apartment tomorrow." (*Id.*). Plaintiff "seemed unenthusiastic and emotionally restricted in considering

14

expanding his world." (*Id.*).

At a May 17, 2021 therapy session, Plaintiff continued to work on his "ongoing struggle with depression." (*Id.*, PageID.1188). He "processed his immobilization due to depression, lack of interest in food, lack of being able to concentrate, get out of the home and be negotiating with others in a work environment." (*Id.*). He also complained of inconsistent sleep and inability to structure himself. (*Id.*). He "recognize[d] his isolation due to depression[] and his lack of desire to get outside in the sunshine." (*Id.*).

Plaintiff met with Dr. Quinn again on May 19, 2021. (*Id.*, PageID.1189). He had passive interview behavior, "soft, slowed" speech, a dysphoric mood, and a mildly blunted affect. (*Id.*). His insight was fair and his functional status was "[m]oderately impaired." (*Id.*). Dr. Quinn made the following notes:

> [Plaintiff] remains pretty much confined to his apartment rarely venturing out and seldom doing anything that required much energy. He sleeps on the couch, reads on the couch and ventures into the bathroom and kitchen on occasion. He essentially cooks rice in a pot and "adds stuff to it." His mother is coming to pick him up to take him to the library to pick up a book today but such activity is a rarity for him. He is awaiting a disability hearing scheduled for 6/22/2021. He is both happy he has a date but concerned because he has something to actually worry about now. He did receive his second COVID vaccination on 5/17 and was glad his arm hurt and he had mild symptoms because he at least knew it was having an effect. He has a "lack of motivation" to much of anything except read and does that in part because he can go at his own pace and interrupt it any time he wants. He sleeps a lot and once last week slept 12 hours. I encouraged him to try to be more active and start a walking program. He reported he needed a new prescription for Concerta mailed to him soon.

15

> We reviewed his medications and he reported no side effects or concerns. He has little energy and little motivation despite being theoretically on energy producing medications. Appetite is limited and sleep seems excessive. He denied suicidal ideation. He is awaiting a positive response to his disability application. He needs refills for two of his medications.

(*Id.*, PageID.1190).

In therapy on June 1, 2021, Plaintiff felt that alcohol had "saved his life as he believe[d] that he would have been overcome with the feelings of grief" regarding his losses. (*Id.*, PageID.1198). DeVivo opined that Plaintiff "still ha[d] denial about his ability to manage alcohol" and "struggled to feel powerless to the addiction[.]" (*Id.*, PageID.1199). A week later, on June 7, 2021, Plaintiff "shared his difficulty managing his depression and his isolation and lack of energy that he is so often challenged with." (*Id.*, PageID.1200). Plaintiff also examined "how out of control his life was and how it felt everything was falling apart on him." This note concludes the record evidence of Plaintiff's therapy sessions at Home of New Vision.

The record also contains evidence regarding inpatient hospitalizations that were considered by the ALJ. The first was on March 9, 2014, when Plaintiff presented to Michigan Medicine for evaluation and treatment. (ECF No. 10-8, PageID.944). His chief complaint was depression. (*Id.*). Plaintiff described frustrating experiences in his Ph.D. program for neuroscience and said he had been drinking a fifth of liquor daily for the past week to destress. (*Id.*). Within the past

16

week, Plaintiff had also not left his home, attempted to complete his work, or showered, except for showering right before presenting to the hospital. (*Id.*). He did however continue with household chores for that week. (*Id.*). Plaintiff also complained of "a lingering feeling of constant worry[,]" waking several times throughout the night, and having a loss of appetite. (*Id.*, PageID.945). He was discharged that day after a full evaluation, prescribed Prozac and gabapentin, and scheduled for a follow up appointment at the Crisis Support Clinic. (*Id.*, PageID.946).

Plaintiff returned to Michigan Medicine for his follow up appointment on March 14, 2014. (*Id.*, PageID.951). He described his struggles with depression and anxiety in relation to his Ph.D. program and was found to have a depressed, anxious, and irritable mood. (*Id.*, PageID.952-954). His affect was restricted in range, but he denied any suicidal or homicidal ideas. (*Id.*). His insight and judgment were fair, and he presented as disheveled with poor hygiene. (*Id.*).

On March 28, 2014, Plaintiff presented to the Michigan Medicine Crisis Support Clinic for further assessment of his depression. (*Id.*, PageID.955). He said that he was self-medicating with alcohol for his anxiety, though he reported that Neurontin had helped reduce his anxiety. (*Id.*). His depression remained the same as before, and he had abstained from alcohol for two weeks but returned to drinking within the past week. (*Id.*). He also reported difficulty concentrating

17

while teaching graduate courses; endorsed anhedonia and low energy; and had not been writing.  (*Id.*).

On examination, Plaintiff again had a depressed, anxious, and irritable mood with a congruent, restricted affect.  (*Id.*, PageID.957).  His insight and judgment were again fair, and he remained without suicidal or homicidal ideas.  (*Id.*).  The provider explained that the Crisis Support Clinic provided short-term care, and Plaintiff returned for sessions in April and May 2014.  (*Id.*, PageID.957-964).

On September 3, 2017, Plaintiff went to Michigan Medicine Psychiatric Emergency Services after texting his ex-girlfriend that he was going to kill himself. (*Id.*, PageID.988-989).  He was brought in by the Ann Arbor police.  (*Id.*). Plaintiff initially presented as "quite anxious and pacing but eventually calmed down with verbal reassurance and lorazepam."  (*Id.*).  Upon being interviewed, Plaintiff explained that he was never suicidal but had texted his ex-girlfriend as "a way to get her to care about him."  (*Id.*).  He denied having a depressed mood but described his psychosocial stressors, which were his relationship, career, financial stress, and ailing father.  (*Id.*).  He "acknowledge[d] that he was pretty drunk earlier but [wa]s working on cutting back" and "[did] not see a reason to follow up with outpatient psychiatry at [that] time because he was never suicidal."  (*Id.*).  On examination, his insight, judgment, and impulse control were found to be "marginal."  (*Id.*, PageID.990).  He was released that day, as his suicide threat was

"less suggestive of a depressive disorder and more related to problems with impulse control and stress management" that could be addressed with outpatient treatment.  (*Id.*, PageID.991).

Plaintiff returned to Michigan Medicine on September 10, 2017.  (*Id.*, PageID.997).  He was brought in restraints and in a drunken state after his mother was concerned about alcohol withdrawal symptoms.  (*Id.*, PageID.998).  Upon review, Plaintiff was tremulous and anxious.  (*Id.*, PageID.1002).  He denied suicidal or homicidal ideation but was deemed appropriate for inpatient admission for alcohol withdrawal, suicidal ideation, and homicidal ideation.  (*Id.*).  The next day, Plaintiff reported that his mood was " 'terrible,' including poor sleep, low energy and poor appetite."  (*Id.*, PageID.1010).  He repeatedly denied being suicidal.  (*Id.*).  Plaintiff also said that "[h]e was a neuroscience PhD student until recently when he timed out from his studies after 10 years in an attempt to complete his degree."  (*Id.*, PageID.1011).

Plaintiff was discharged on September 13, 2017, but returned on September 28, 2017, after he called 911 because he was afraid he would hurt himself.  (*Id.*, PageID.1025).  He appeared labile, tearful, and restless; vacillated between whispering and shouting; and was pacing throughout conversation.  (*Id.*).  He was also difficult to direct, had poor grooming and hygiene, and was "somewhat malodorous."  Plaintiff reported a "longstanding history of depression throughout

19

most his life" that had "worsened significantly over the past month." His

depression was triggered by the ending of his relationship but the depression had

since " 'taken on a life of its own.' " (*Id.*). He had begun "drinking excessively

every day, not attending to his [activities of daily living], or going to work." (*Id.*,

PageID.1025-1026).

Upon examination, Plaintiff appeared somewhat frail and shaky, his mood

was dysphoric, affect restricted, and had pessimistic thinking. (*Id.*; ECF No. 10-9,

PageID.1046). He'd had "previous aborted suicide attempts" and an overall low

risk "now but is elevated more so when severely intoxicated/using etoh." (ECF

No. 10-9, PageID.1046). He was not recommended a specific antidepressant at

that time, but an SSRI was to be considered later "given past episodes of

depression/anxiety." (*Id.*).

### III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB and SSI are available only for those who have a

"disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act

defines "disability" as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The

Commissioner's regulations provide that a disability is to be determined through

the application of a five-step sequential analysis:

>Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

>Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

>Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

>Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

>Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps. . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 1, 2015, the alleged onset date. (ECF No. 10-2, PageID.45). At Step Two, the ALJ found that Plaintiff had the severe impairments of depression, anxiety, attention deficit hyperactivity disorder (ADHD), and substance abuse in remission. (*Id.*). At Step Three, the ALJ found that none of Plaintiff's impairments met or medically equaled a listed impairment. (*Id.*, PageID.45-47).

The ALJ then assessed Plaintiff's residual functional capacity (RFC), concluding that he was capable of performing a full range of work at all exertional levels, except that he

> [m]ust avoid work at unprotected heights or around dangerous, moving machinery; no climbing of any ladders, ropes or scaffolds; no driving in the course of employment; has the ability for simple, routine and repetitive tasks with an SVP of 1 or 2; has the ability for routine work that does not require changes in work settings or duties more than once a month; should avoid work with the general public, but allowing for superficial contact with the public; has the ability for occasional contact with coworkers and supervisors; [and] must avoid work at a fast production pace where the pace is set by others (i.e., no assembly line or conveyor belt work)[.]

(*Id.*, PageID.47).

At Step Four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.*, PageID.54). However, in considering Plaintiff's age, education, work experience, and RFC, the ALJ determined that Plaintiff could

22

perform the jobs of hand packager (150,000 jobs nationally), hospital cleaner
(100,000 jobs), and industrial cleaner (500,000 jobs), which exist in significant
numbers in the national economy. (*Id.*, PageID.55). As a result, the ALJ
concluded that Plaintiff was not disabled under the Act. (*Id.*, PageID.59).

### IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final
administrative decision under 42 U.S.C. § 405(g). Although a court can examine
portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health
& Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one. Judicial
review is constrained to deciding whether the ALJ applied the proper legal
standards in making his or her decision, and whether the record contains
substantial evidence supporting that decision. *Tucker v. Comm'r of Soc. Sec.*, 775
F. App'x 220, 224-25 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506,
509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts
of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*,
880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139
S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence." 42
U.S.C. § 405(g). The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence

23

to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal

24

quotation marks and citation omitted).  Finally, even if the ALJ's decision meets
the substantial evidence standard, "a decision of the Commissioner will not be
upheld where the [Social Security Administration (SSA)] fails to follow its own
regulations and where that error prejudices a claimant on the merits or deprives the
claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,
651 (6th Cir. 2009) (internal quotation marks and citations omitted).

## V.     Analysis

### A.     Parties' Arguments

Plaintiff argues that the ALJ's decision is not supported by substantial
evidence because he (1) failed to properly evaluate Dr. Quinn's medical opinions
under current regulations,[2] and (2) erred in evaluating Plaintiff's subjective
symptoms by finding them not consistent or supported by the record evidence.  In
response, the Commissioner argues that both findings were supported by
substantial evidence.

### B.     Opinion Evidence

#### 1.     Legal Standard

---

[2] Although Plaintiff cites the current applicable regulations, he also cites *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir, 2013) and *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) (per curiam), which apply an old regulation called the "treating physician rule" (TPR).  The TPR required more deference to a treating source opinion than the updated regulations and does not apply to this case.

When evaluating a medical opinion, the ALJ must articulate "how persuasive [he] find[s] all of the medical opinions and all of the prior administrative medical findings in [the claimant's] case record." 20 C.F.R. § 404.1520c(b). The ALJ evaluates the persuasiveness of the medical opinions and prior administrative medical findings by utilizing the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors. § 404.1520c(c). Supportability and consistency are the most important factors and the ALJ must explain how he considered these factors in his decision. § 404.1520c(b)(2).

### 2.     Medical Opinions of Record

Regarding Plaintiff's mental RFC, the ALJ considered the opinions of the state agency psychological consultants Sheila C. Williams-White, Ph.D. (Dr. Williams-White) and George Starrett, Ed.D. (Dr. Starrett), consulting psychologist Michael Brady, Ph.D. (Dr. Brady), and treating psychologist Dr. Quinn, who rendered two medical opinions, one joined by DeVivo and the other by Brenda Barnett, L.L.B.S.W. (Barnett). (ECF No. 10-2, PageID.52-53). The ALJ found that Dr. Williams-White, Dr. Starrett, and Dr. Brady were not restrictive enough in their opinions of Plaintiff's abilities, but that Dr. Quinn's opinions were overly restrictive based on the medical record, which largely consists of notes from Dr. Quinn and DeVivo. (*Id.*).

26

On July 22, 2020, Dr. Brady was consulted to examine Plaintiff and provided a psychiatric/psychological medical report to the Social Security Administration.  (ECF No. 10-7, PageID.786).  He opined that Plaintiff met the diagnostic criteria for major depressive disorder and ADHD, but that the "mental status examination revealed no abnormalities in mental capacity." (*Id.*, PageID.789).  He also opined that

> [Plaintiff's] ability to relate and interact with others, including coworkers and supervisors, is moderately impaired.  His depression and distress could affect his interpersonal relationships in the workplace.  His ability to understand, recall, and complete tasks and expectations does not appear to be significantly impaired.  His ability to maintain concentration was fair.  His ability to withstand the normal stressors associated with a workplace setting is moderately impaired.

(*Id.*).

The ALJ found that Dr. Brady's opinion was supported by his own findings on examination, but not consistent with the totality of the evidence of record. (ECF No. 10-2, PageID.52-53).  The ALJ explained that although Dr. Brady's finding on Plaintiff's limitations in interacting with others and withstanding normal workplace stressors was consistent with the record, Dr. Brady's assessment on Plaintiff's understanding, recall, completion of tasks, and maintaining concentration was not consistent, given Plaintiff's ADHD treatment, lack of motivation when depressed, and anhedonia as noted in treatment records. (*Id.*, PageID.53).

27

On August 5, 2020, based on the record evidence to that date, Dr. Williams-White opined that Plaintiff did not meet a listing and had no difficulties understanding, remembering, or applying information; mild difficulty interacting with others; moderate difficulties with concentration, persistence, and pace; and mild difficulty adapting or managing oneself.  (ECF No. 10-3, PageID.129-130). She went on to explain,

> [Plaintiff] has a long history of substance abuse and mental health treatment.  He has had inpatient treatment several times and reports being abstinent for 3 years.  There is [a] letter in the chart (undated) by a nonapproved program source who provided treatment to [Plaintiff]. The therapist does report [Plaintiff] has mental impairments that impact his functioning.  [Plaintiff] has a long history of high level functioning including being a teacher assistance [sic] in college for 9 years.
>
> [Plaintiff] was initially seen for depression through his PC in 2014.  At follow up in 3/2016 symptoms were reported to improve and [Plaintiff] denied diminish of interest, pleasure and fatigue.  He had been off medication for 6 months.  I[n] 2017: [Plaintiff] was admitted to the hospital due to Alcohol Withdrawal, with suicidal ideation and depression.  [Plaintiff] started treatment for alcohol abuse, suicidal ideation and ADHD.  [Plaintiff] had a nonsevere impairment.  When he is not drinking, the symptoms of depression are decreased and manageable.  This is a nonsevere impairment as the evidence and statement of functioning fail to establish that the alleged impairment imposes significant limitations on [Plaintiff's] ability to perform work related activities.

(*Id.*, PageID.117).

Upon reconsideration of Plaintiff's initial disability denial, Dr. Starrett examined the record to date on December 16, 2020, making the same findings as Dr. Williams-White regarding Plaintiff's level of difficulties with understanding, remembering, or applying information; interacting with others; concentration, persistence, and pace; and adapting or managing oneself.  (ECF No. 10-3, PageID.148).  He further stated,

> The current CE finds MDD, ADHD and Alcohol Use Disorder in sustained remission.  His MSE is intact for cognitive processes, his mood and affect were depressed.  The MSS indicates moderate limitations in terms of his social situations but [Plaintiff] responds on his ADL forms that he gets along with others and that he is well liked. Concentration was related as fair.  [Plaintiff's] ability to understand, recall and complete tasks was not significantly impaired.  It appears that the claimant has improved since the abstention from alcohol.  The DA/A appears to be material in this case.

(*Id.*, PageID.148).

The ALJ found that the moderate limitations in concentration, persistence, or pace were supported by the record, but that "Dr. Williams-White's and Dr. Starrett's assessments show far less limitations in mental functioning compared to the totality of the evidence."  (ECF No. 10-2, PageID.52).  The ALJ opined that the evidence suggested a moderate limitation in functioning overall, which he accounted for in the RFC.  (*Id.*).

Dr. Quinn and Barnett authored an examining medical opinion regarding Plaintiff's functional limitations on October 28, 2019.  (ECF No. 10-7,

29

PageID.596).  In the report, it is noted that Plaintiff presented with "fair to poor personal hygiene and grooming" and his clothes were "unwashed and malodorous." (*Id.*).  He appeared "anxious, as evidenced by his constant fidgeting, and loud, rapid, and repetitive speaking tone and style." (*Id.*).  Plaintiff reported nervousness and had been diagnosed with major depressive disorder, attention deficit disorder, anxiety disorder, and alcohol dependence in remission. (*Id.*).  He was currently taking "Methylphenidate ER 36mg, Bupropion XL 300mg, Fluoxetine 60mg, Proprarolol 10mg twice daily as needed for anxiety, and Trazodone 100mg." (*Id.*).

Dr. Quinn and Barnett also summarized Plaintiff's personal, occupational, physical, psychiatric, and substance abuse history. (*Id.*, PageID.596-598).  They then opined on his functional limitations. (*Id.*, PageID.598-599).  Regarding Plaintiff's ability to understand, remember, and apply information, they found that his "lack of ability to apply information creates a barrier for obtaining and maintaining employment." (*Id.*, PageID.598).  They did not describe issues with his ability to understand or remember.  As to his interactions with others, they noted that he "has little to no interaction with others" and "has had no serious relationships in his life." (*Id.*).  They described how he isolates himself from his supports due to his depression, and found that his "lack of interaction, and poor interaction when necessary, demonstrates [his] inability to interact with others in a

work place, creating a barrier for obtainment of income." (*Id.*).  On concentration,

persistence, and pace, Dr. Quinn and Barnett opined that Plaintiff has a "clear lack

of ability to persist and initiate or maintain pace, characteristics that are necessary

to obtain and maintain employment." (*Id.*, PageID.599).  This was evidenced by

Plaintiff's inability to follow through with necessary steps to apply for Social

Security disability at that time.  (*Id.*).  Finally, they found that "[n]ot being able to

manage and adapt himself to employment is a real barrier in [Plaintiff's] treatment

and keeps [him] unable to obtain an income." (*Id.*).  Plaintiff's poor adaptation and

management skills were also evidenced by his inability to follow through with

many steps in the disability application process.  (*Id.*).

 Dr. Quinn authored a second medical opinion regarding Plaintiff's

functional limitations with DeVivo on May 12, 2021.  (ECF No. 10-9,

PageID.1172).  They found that Plaintiff had the following symptoms: restlessness,

easily fatigued, difficulty concentrating, irritability, depressed mood, diminished

interest in almost all activities, appetite disturbance with change in weight, sleep

disturbance, decreased energy, and feelings of guilt or worthlessness.  (*Id.*).  They

said further that he had moderate to extreme limitations in all areas of

understanding and memory; adaptation; sustained concentration and persistence;

and social interaction.  (*Id.*, PageID.1173-1174).  They wrote: "[Plaintiff] remains

at home, does not go out, has not been able to work, [and] has received 15-18 day

31

hospital treatment[s] to stabilize[.]"  (*Id.*, PageID.1175).  Lastly, they opined that

Plaintiff took medication with significant side effects (though they failed to

identify the medications and side effects as indicated on the form), and that

Plaintiff would likely be absent from work more than four times per month as a

result of his impairments or treatment.  (*Id.*).

The ALJ found neither of the above opinions of Dr. Quinn, DeVivo, and

Barnett to be persuasive.  (ECF No. 10-2, PageID.53).  In short, he stated that

Plaintiff's work history shows greater functioning than the opinions described, that

his treatment records were not consistent with the level of limitations in the

opinions, and that the records consistently noted a lack of side effects from

medication, contravening the latter opinion that Plaintiff had significant side

effects from his medication.  (*Id.*).

### 3.     Discussion

Under § 404.1520c(b)(2), the ALJ must specifically address the factors of

supportability and consistency.  Supportability means that "[t]he more relevant the

objective medical evidence and supporting explanations presented by a medical

source are to support his or her medical opinion(s) or prior administrative medical

finding(s), the more persuasive the medical opinions or prior administrative

medical finding(s) will be."  § 404.1520c(c)(1).  Consistency means that "[t]he

more consistent a medical opinion(s) or prior administrative medical finding(s) is

with the evidence from other medical sources and nonmedical sources in the claim,
the more persuasive the medical opinion(s) or prior administrative medical
finding(s) will be." § 404.1520c(c)(2). Further, the ALJ is required to provide a
"sufficiently detailed articulation of application of those factors in which the ALJ
must show their work, i.e., to explain in detail how the factors actually were
applied to each medical source." *Huizar v. Comm'r of Soc. Sec.*, 610 F. Supp.
1010, 1020 (E.D. Mich. 2022) (cleaned up). In other words, the regulations
"require that the ALJ provide a coherent explanation of his reasoning." *Lester v.
Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at *14 (N.D. Ohio Dec. 11, 2020),
*report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, 2021
WL 119287 (N.D. Ohio Jan. 13, 2021).

Plaintiff argues that the ALJ failed to consider the consistency of the
opinions with one another; their consistency with Plaintiff's testimony; the nature
of the treating relationship; and Dr. Quinn's specialization. (ECF No. 15,
PageID.1216). He also argues that the ALJ failed to adequately discuss the
supportability of the opinions. (*Id.*).

As noted above, the ALJ is only *required* to discuss supportability and
consistency, as he did here. The other factors are still to be considered, but in the
absence of an egregious error, such as no medical opinion of record supporting a
disability finding, a decision should not be remanded for failing to discuss these

factors.  Here, the ALJ adequately discussed the supportability and consistency of the Dr. Quinn opinions, finding that "their extreme assessments of [Plaintiff's] mental functional limitations are not supported by their clinical treatment records, which documented minimal abnormal mental status signs and clinical notations that the claimant improved with prescribed treatments."  (ECF No. 10-2, PageID.53).  His finding that they were not persuasive is supported by substantial evidence.

Plaintiff argues that the ALJ pointed out only minor discrepancies in the opinions with the record.  This may be the case as to Plaintiff's work history and the reason he discontinued his Ph.D. program, but the ALJ also thoroughly and accurately discussed Plaintiff's treatment and hospitalization records, and reasonably concluded that they did not support the level of impairment suggested by Dr. Quinn.  It is the ALJ's overall opinion which must be considered, and minor discrepancies are not indicative of error.  *See Stacie B. v. Comm'r of Soc. Sec.*, No. 2:23-CV-1411, 2023 WL 8251252, at *7 (S.D. Ohio Nov. 29, 2023) (explaining that "an ALJ's opinion must be read as a whole") (citing *Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014)), *report and recommendation adopted*, 2024 WL 20734 (S.D. Ohio Jan. 2, 2024).

As evidence that the opinions of Dr. Quinn, DeVivo, and Barnett were consistent with the record, Plaintiff points to treatment records noting "persistent

severe anhedonia" and "isolation despite treatment."  (ECF No. 15, PageID.1217 (citing ECF 10-7, PageID.596, 666, 668, 748, 809, 836, 905; ECF 10-9, PageID.1153, 1180, 1188-1190, 1200)).  Plaintiff also points to his persistent depression throughout the treatment records and found in Dr. Brady's consultative examination.  (ECF No. 10-7, PageID.788).

However, the ALJ accurately summarized the record in his decision, noting inconsistency in Plaintiff filling his prescriptions, (ECF No. 10-2, PageID.50), largely normal or unremarkable findings in Plaintiff's mental status examinations, (*id.*), improvements in Plaintiff's mood and affect generally and from medications, (*id.*, PageID.50-51), activities such as walking, exercising, grocery shopping, reading, and voting, (*id.*, PageID.51), and maintenance of sobriety, (*id.*).

Plaintiff might wish "the ALJ had interpreted the evidence differently." *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017).  But the law prohibits the Court from re-weighing the evidence and substituting its judgment for the ALJ's.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide

35

questions of credibility, or substitute its judgment for that of the ALJ.")).  Because the ALJ properly evaluated and discussed the supportability and consistency of Dr. Quinn's opinions, the ALJ has satisfied the requirements of the regulations.  *See* 20 C.F.R. § 404.1520c(b)(2).

Furthermore, as to the factors the ALJ was not required to discuss, Plaintiff has not explained why Dr. Quinn's specialization should weigh more highly than that of the other medical opinion providers, all of whom have relevant advanced degrees in psychology or psychiatry.  Dr. Quinn's treatment relationship with Plaintiff is certainly extensive and relevant, but the ALJ discounted her opinions in large part based on her own treatment records with Plaintiff, which did not reflect the same moderate-to-extreme limitations that the opinions contained.  (ECF No. 10-2, PageID.53-54).  As the Commissioner notes, Plaintiff's mental findings were generally unremarkable in the extensive treatment records from Dr. Quinn and DeVivo.  (ECF No. 17, PageID.1239 (citing ECF No. 10- 7, PageID.724-769, 772-780, 783-784, 798-804, 808, 810-812, 815, 817, 825, 829, 835, 844, 900, 902, 908, 910, 916, 920-926; ECF No. 10-9, PageID.1128, 1133, 1141, 1143, 1149, 1153, 1164, 1168)).  Thus, the ALJ's failure to explicitly consider Dr. Quinn's treating relationship with Plaintiff in this part of his opinion, which is not required by the regulations, was not an error.

Finally, as to the consistency of the opinions with Plaintiff's testimony, this

is undercut by the ALJ's finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (ECF No. 10-2, PageID.48). For reasons that will be examined below, this finding is supported by substantial evidence, and as such, the inconsistency of the ALJ's findings with Plaintiff's testimony is not cause for remand.

### C. Subjective Symptom Evaluation

#### 1. Standard

Plaintiff challenges the ALJ's consideration of Plaintiff's subjective allegations. Under the Social Security Regulations (SSR), the ALJ was required to follow a two-step process when evaluating Plaintiff's subjective symptoms. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). Under SSR 16-3p, an ALJ must analyze the consistency of Plaintiff's statements with the other record evidence, considering her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in that regulation. This analysis and the conclusions drawn from it—formerly termed a "credibility" determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *see also Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (explaining that SSR 16-3p merely eliminated "the use of the word 'credibility' . . . to 'clarify that subjective

37

symptom evaluation is not an examination of an individual's character.' ").

The ALJ must first confirm that objective medical evidence of the underlying condition exists, and then determine whether that condition could reasonably be expected to produce the alleged subjective symptom(s), considering other evidence, including: (1) daily activities; (2) location, duration, frequency, and intensity of the symptom(s); (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication received; (6) any means used to relieve the symptom(s); and (7) other factors concerning functional limitations. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

The ALJ accurately summarized Plaintiff's testimony, noting Plaintiff's alleged long periods of inactivity, lack of interest and ability to complete simple tasks, and struggles with ADHD and depression. (ECF No. 10-2, PageID.47-48). As noted above, the ALJ concluded that while Plaintiff's impairments could be expected to cause his alleged symptoms, the intensity, persistence, and limiting effects of his symptoms were not consistent with the medical and other evidence of record. (*Id.*, PageID.48).

## 2.    Discussion

The analysis here largely echoes that of the previous section of this opinion. While Plaintiff often presented with a constricted affect and somber mood, his other mental facilities were generally normal or unremarkable in both Dr. Quinn's

and DeVivo's notes.  Plaintiff struggled with anhedonia, isolation, and depression, but his condition steadily improved throughout his sessions with DeVivo.  *See* ECF No. 10- 7, PageID.724-769, 772-780, 783-784, 798-804, 808, 810-812, 815, 817, 825, 829, 835, 844, 900, 902, 908, 910, 916, 920-926; ECF No. 10-9, PageID.1128, 1133, 1141, 1143, 1149, 1153, 1164, 1168.  Dr. Quinn's notes reflect that he had begun taking on tasks such as grocery shopping, going to the library, visiting his mother, and cooking more involved meals, which somewhat contradicts Plaintiff's testimony regarding the degree of his isolation and inability to shop for groceries or prepare meals.  *Compare id.*, *with* ECF No. 10-2, PageID.76-78.

Plaintiff again takes issue with the ALJ's summation of Plaintiff's record of taking his medications and his work history.  As analyzed above, though there may be some discrepancies between the record and the ALJ's opinion regarding Plaintiff's medications, it is clear from the record that Plaintiff did not consistently pick up or take his ADHD medication, despite doing so with his other medications. Plaintiff's work history also supports the ALJ's determination; though Plaintiff eventually either quit or was removed from his Ph.D. program, he remained in the program for ten years and received his stipend throughout that period.  His eventual inability to maintain his performance as a Ph.D. candidate does not shed light on whether he would be unable to do other, much simpler work, in

accordance with the ALJ's RFC.

Taking Plaintiff's impairments into account, the ALJ limited Plaintiff to simple, routine, and repetitive tasks; a lack of changes in work settings or duties more than once a month; avoidance of work with the public; and no fast production pace work where the pace is set by others, such as assembly line or conveyor belt work. (ECF No. 10-2, PageID.47). Ultimately, Plaintiff bears the burden of showing that he is limited beyond the RFC. *See* 20 C.F.R. §§ 404.1512, 416.912; *Her v. Commissioner*, 203 F.3d 388, 391 (6th Cir. 1999). The Court agrees with the Commissioner that Plaintiff has not met this burden, but instead asks the Court to impermissibly reweigh the evidence. *Mullins v. Sec'y of Health & Hum. Servs.*, 680 F.2d 472 (6th Cir. 1982). Instead, the Court finds that the ALJ's opinion is supported by substantial evidence based on the record before the Court, which is all that is required to affirm the ALJ's decision. *See Blakley*, 581 F.3d at 406 (holding that "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." (internal quotations omitted)).

Because the ALJ's weighing of opinion evidence and subjective symptom evaluation are supported by substantial evidence, his decision is affirmed.

## VI.    Conclusion

In the end, Plaintiff suffers from impairments that affect his daily living, as

the ALJ found.  However, his impairments do not rise to the level of precluding Plaintiff from performing work consistent with the RFC crafted by the ALJ. Substantial evidence supports the Commissioner's decision that Plaintiff is not disabled within the meaning of the Act.

Accordingly, for the reasons stated above, Plaintiff's motion for summary judgment, (ECF No. 15), is DENIED; the Commissioner's motion for summary judgment, (ECF No. 17), is GRANTED; and the ALJ's decision is AFFIRMED.

SO ORDERED.

Dated: March 21, 2024
Detroit, Michigan

s/Kimberly G. Altman
KIMBERLY G. ALTMAN
United States Magistrate Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 21, 2024.

s/Kristen Castaneda
Kristen Castaneda
Case Manager